UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KARMA SONAM,                                        :

                        Petitioner,        :        **MEMORANDUM DECISION**

                - v -                      :        1:21-cv-7004 (DC)

DONAHUE,                                            :

                        Respondent.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


APPEARANCES:            KARMA SONAM
                        Petitioner *Pro Se*
                        DIN 14-A-4154
                        Sing Sing Correctional Facility
                        354 Hunter Street
                        Ossining, NY 10562

                        MELINDA KATZ, Esq.
                        District Attorney, Queens County
                        By:    Nancy Fitzpatrick Talcott, Esq.
                               Assistant District Attorney
                        125-01 Queens Boulevard
                        Kew Gardens, NY 11415
                               Attorney for Respondent

CHIN, Circuit Judge:

        On April 11, 2014, following a jury trial, petitioner Karma Sonam was

convicted in the Supreme Court of New York, Queens County (Buchter, *J.*), of two

counts of murder in the second degree, N.Y. Penal Law § 125.25(1), (3), one count of

1

robbery in the first degree, *id.* § 160.15(2), and one count of criminal possession of a weapon in the second degree, *id.* § 265.03(a), (b).  Dkt. 4-10 at 129, 135-37, 142.  The court sentenced Sonam to a total term of twenty-five years to life, consisting of concurrent terms of twenty-five years to life for the murder charges, twenty years for the robbery count, and fifteen years for the criminal possession of a weapon charge.  Dkt. 4-10 at 203.  Sonam was also sentenced to five years of post-release supervision.  *Id.*

On April 30, 2018, Sonam appealed his conviction on the grounds that (1) the trial court improperly permitted entry of a surveillance video of the incident as well as the autopsy report of the victim, without proper authentication; (2) Sonam's statements should have been suppressed because the People did not prove that he was aware of his *Miranda* rights; (3) the People committed *Brady* violations that deprived him of due process; and (4) his sentence was cruel and excessive.  *See* Dkt. 4-1 at 32-61.

On February 5, 2020, the Appellate Division, Second Department, affirmed the convictions, *People v. Sonam*, 180 A.D.3d 717 (2d Dep't 2020) ("*Sonam I*"), and the New York Court of Appeals denied Sonam's application for leave to appeal, *People v. Sonam*, 35 N.Y.3d 1029 (2020) (Feinman, J.) ("*Sonam II*").  Sonam filed a motion for reconsideration, which the court denied.  *People v. Sonam*, 35 N.Y.3d 1097 (2020) (Feinman, J.) ("*Sonam III*").

By papers dated December 7, 2021, and received by this Court on December 14, 2021, Sonam filed the instant *pro se* writ of habeas corpus pursuant to 28

U.S.C. § 2254 (the "Petition").  *See* Dkt. 1 at 1-17.  In the Petition, Sonam contends that (1) the admission of the video and autopsy report denied him a fair trial; (2) the court erroneously denied his motion to suppress his statements to the police because the state failed to adequately demonstrate probable cause or prove a valid waiver of his *Miranda* rights; (3) the People's discovery violations denied him a fair trial; (4) the trial court's 25-years to life sentence was cruel and excessive in light of his age; and (5) the evidence at trial was legally insufficient to establish his guilt and the verdict was against the weight of the evidence.  *See generally* Dkt. 13; *see also* Dkt. 1-2 at 124.

For the reasons set forth below, Sonam's motion is denied.

### STATEMENT OF THE CASE

**A.**    ***The Facts***

**1.**    ***The Shooting***

On March 16, 2011, at approximately 9:30 p.m., thirty-year-old Chris Song and Bernard Cho met in the parking lot of a Korean Supermarket in Queens County to eat dinner and meet a friend of Cho's for a purported business opportunity related to Song's job.  Dkt. 4-8 at 165, 166-68, 245.  Cho was a marijuana dealer in the neighborhood.  *Id.* at 257.  While Cho and Song were waiting in Song's car for the unnamed friend to show up, sixteen-year-old Karma Sonam and eighteen-year-old Caleb Ahn, walked by.  *See id.* at 170, 202; *see also* Dkt. 4-1 at 78.  Cho stated that he thought those were the guys who they planned to meet and rolled down the window to

call them over.  Dkt. 4-8 at 170.  As Sonam and Ahn walked towards the car, Song asked Cho if those were the individuals they were waiting for and Cho said they were not.  *Id.* Sonam and Ahn approached the window and asked for directions to Peck Park in Fresh Meadows, Queens.  *Id.* at 171.  As the four discussed directions, Sonam and Ahn entered the backseat of the car and began discussing mutual people they knew in the neighborhood.  *Id.* at 171-72.  Sonam, the shorter of the two, wore a gray hoodie and sat behind Song in the driver's seat of the car.  *Id.* at 173-74.  Ahn, the taller of the two, had a Mohawk hairstyle and identified himself as "Dan."  *Id.* at 172-73, 242.  Eventually, the three discussed purchasing marijuana, and executing a sale of ten pounds of marijuana to Sonam and Ahn.  *Id.* at 174-175.  Song claimed that he was not aware when meeting up with Cho that Cho planned to orchestrate a marijuana deal.  *Id.* at 175.

Song had no interest in being part of the deal, but Cho continued to discuss the quantity and prices of the marijuana with Sonam and Ahn.  *Id.* at 176. Sonam and Ahn asked to see a sample of the marijuana, and Cho walked over to his car parked on the other side of the parking lot and grabbed a briefcase that contained a pound of marijuana inside.  *Id.* at 177-79.  After Sonam and Ahn examined the marijuana, they stepped out of the car to speak with a third-party over the telephone. *Id.* at 176-78, 182.  The two became agitated.  *Id.* at 182.  When they came back inside the car, one of the two young men asked Song if they could have his chain.  *Id.* at 183-84. Song turned around and Sonam and Ahn pulled out guns, demanding his chain and

wallet. *Id.* at 184. Sonam then hit Song over the head with a silver gun, and Song jumped out of the vehicle and ran towards the supermarket. *Id.* at 184-86. The other individuals then jumped out of the vehicle. *Id.* at 185-86. While in flight, Song was shot in the back. *Id.* at 186-87. Sonam and Ahn then struggled with Cho over the briefcase. Dkt. 4-9 at 2, 22. Song managed to run inside the store and dial 911. Dkt. 4-8 at 188.

During the altercation, a man, Christopher Eix, emerged from the supermarket and witnessed the four men arguing and struggling over the briefcase in Song's vehicle.[1] Dkt. 4-6 at 201, 207-09. Shortly thereafter, Eix heard gunshots, ducked behind his car for cover, and saw an individual run from the vehicle toward the supermarket. *Id.* at 201; 203-04.

After the initial gunshots, Sonam and Ahn reentered the car in the driver and passenger seats of the vehicle, while Cho entered the backseat to try to gain control of the car. *See* Dkt. 4-8 at 107. Sonam and Ahn then attempted to take off in the car and collided with another vehicle, at which point Cho fled from the back of the car. Dkt. 4-6 at 205-07, 212. As Cho was fleeing, he was shot and killed. *See id.* at 215-16; Dkt. 4-9 at 95.

---

[11]    Eix's testimony was inconsistent with Song's, who testified that he did not struggle over the briefcase with Sonam and Ahn.

2.    *The Arrest & Investigation*

Shortly after the altercation, police officers arrived at the scene and found Cho lying unconscious on the pavement.  Dkt. 4-3 at 167.  One of the responding officers (Officer McCloskey) received a radio call that the shooter "was a male Asian" which prompted him to canvas the area.  *Id.* at 168.  A female passerby flagged Officer McCloskey down and informed him that "an Asian kid" had run down a nearby alleyway "directly across the street."  *Id*.  Officer McCloskey and another officer proceeded to the alleyway and found Sonam "crouched down in a fetal position."  Dkt. 4-3 at 170-72.  A brief struggle ensued between the officers and Sonam, during which Sonam dropped his cellphone.  *Id*. at 171.  The officers mistook the cellphone for a gun and proceeded to subdue Sonam and place him in handcuffs.  *Id*.  Officer McCloskey then turned Sonam over to other officers who then handed him over to detectives who had arrived at the scene.  *Id*. at 172.  The police conducted a showup procedure, during which two witnesses said that Sonam was involved in the incident.  *Id*. at 46-48.

Back at the supermarket, detectives processed the crime scene and recovered three spent .25 caliber shell casings, two 9 mm shell casings, a deformed copper-jacketed lead bullet, and a live .45 caliber cartridge.  Dkt. 4-6 at 22-23; 49-50.  They also recovered a .25 caliber silver firearm between the front passenger seat and the center console, in addition to a discharged .25 caliber shell casing.  Dkt. 4-7 at 9-11, 13-17, 28, 38-39, 73.  No fingerprints or DNA were recovered from the .25 caliber firearm.

Dkt. 4-9 at 164-68.  Detectives also recovered video surveillance footage from the

supermarket purportedly showing the struggle between Sonam, Ahn, and Cho and the

eventual shooting of Cho.  *See generally* Dkt. 4-7 at 123-24; 131-32; Dkt. 4-9 at 22-24.

### 3. *Sonam's Statements to Detectives*

On March 17, 2011, at 1:00 a.m., Detective Joseph Bey and Detective James

Polo began interviewing Sonam.  Dkt. 4-3 at 189-90.  According to Bey, Polo read Sonam

*Miranda* warnings from a preprinted form.  *Id.* at 190; 198-99.[2]  During this interview,

Sonam made an oral statement that he subsequently agreed to put in writing.  *Id.* at 72.

At approximately 5:30 a.m., after Sonam went to the bathroom and had

something to eat, Bey and Polo began another interview with Sonam.  *Id.* at 191.

According to Bey, although Sonam did not receive *Miranda* warnings again, Bey

reminded Sonam that he was given *Miranda* warnings and asked Sonam "if he still

wanted to talk to us," *id.* at 191, to which Sonam verbally agreed, *id.* at 194-95.

At approximately 8:30 a.m., Sonam and Polo met to "review all the

information [they] had obtained."  *Id.* at 192.  Bey testified that, aside from Sonam's

signature at the bottom, he noticed that "most of the captions [at the bottom of the

*Miranda* warnings] were blank," including the date, time, and subject name.  *Id.* at 192-

---

[2]       Polo testified that the interview was "probably like two, two and a half hours, maybe three," Dkt.
4-3 at 72, whereas Bey testified that the interview lasted approximately one hour, *id.* at 198.

94.[3]  When Bey pointed this out, Polo "put in 5:25 as the Miranda warning time."  *Id.* at

192.  Bey subsequently "instructed Detective Polo to cross out the time, initial it, [and]

put in the proper time," 1:00 a.m.  *Id.* at 193.

At 8:35 p.m. on the 17th, Sonam provided a written statement to police, in

which he stated that he and his co-defendant entered a car to purchase marijuana, that

he "took the gun out" in the car and "tried to butt the guy in front of [him],"  and that,

after exiting the car and "get[ting] ready to run," he saw "the older guy fall down from

gunshots that Caleb fired."   Dkt. 4-6 at 98-99.

**B.**    *Procedural History*

**1.**    *State Court Proceedings*

In connection with these events, Sonam and Ahn were charged in Queens

County Supreme Court with two counts of Murder in the Second Degree (New York

Penal Law § 125.25(1) [intentional], (3) [felony murder]), Attempted Murder in the

Second Degree (New York Penal Law §§ 110/125.25(1)), two counts of Robbery in the

First Degree (New York Penal Law § 160.15(1), (2)), Assault in the First Degree (New

York Penal Law § 120.10(4)), Criminal Possession of a Weapon in the Second Degree

(New York Penal Law § 265.03(1)(b)), Assault in the Second Degree (New York Penal

---

[3]        Polo testified that Sonam "wrote his name next to each question" and that it was "signed by myself and Detective Kay that was in the room."  Dkt. 4-3 at 49.

Law § 120.05(2)), and Criminal Possession of Marijuana in the Second Degree (New York Penal Law § 221.25 (repealed 2021).

    **2.**    *The Trial*

Sonam proceeded to trial by jury before the Honorable Richard Buchter in New York Supreme Court, Queens County.

During trial, the People called many witnesses, including Chris Song and Christopher Eix, who testified as to what they observed the night of the crime.  On direct examination, Song testified that he did not see who shot him or Cho.  *See* Dkt. 4-8 at 185-190.  On cross-examination, however, defense counsel impeached Song with a statement he made to police two days after the shooting that he was "one thousand percent sure" that Ahn shot Cho.  Dkt. 4-9 at 5.

The People also introduced into evidence video surveillance taken by detectives from the supermarket showing the shooting and the events preceding it. Dkt. 4-6 at 219.  Detective Mascari testified that on March 17, 2011, he visited the location where the shooting had occurred and downloaded "selected portions" of security footage from the system hard drive onto a USB that was then burned onto three different DVDs.  *Id.* at 131.  Afterwards, the detective deleted the video from the USB drive.  *Id.* at 121.  Sonam objected to the video's admissibility on authenticity grounds, *Id.* at 124, and the court sustained the objection and denied the People's application to enter the video into evidence.  *Id.* at 124-25.  The court, however, eventually admitted

the video into evidence through Eix's testimony. *Id.* at 219. Various witnesses testified as to the vehicle, location, and figures captured in the video, including the struggle over the briefcase and the shooting of Cho itself. *See, e.g.*, Dkt. 4-9 at 22-24. Although neither Sonam's face nor Ahn's face was clearly visible on the video surveillance footage, Cho's shooter could be seen exiting from the passenger side of the vehicle. *See generally* Dkt. 4-8 at 240; Dkt. 4-9 at 171.

The People introduced into evidence a copy of Cho's autopsy report conducted by the Medical Examiner. Dkt. 4-7 at 198. The report detailed, *inter alia*, that Cho sustained five gunshot wounds to his body, three of which were from small caliber bullets that entered his right arm, right hand, and neck. *Id.* at 201-07. The report detailed that Cho died as a result of a "gunshot wound to his torso" that had punctured his heart and lung. *Id.* at 247-48. Sonam objected to the admission of the report because it did not bear the signature of an official attesting to its truth and accuracy. *See id.* at 192. The court admitted the report as a business record pursuant to New York Civil Practice Law and Rules 4518(a) after it found the People had laid sufficient foundation and after examining the certification. *Id.* at 194.

During trial -- and before Eix testified -- it came to light that the People failed to submit discovery material related to Eix's witness statement in a timely manner. *See* Dkt. 4-6 at 240. On the stand, Eix testified that he did not clearly see who exited the vehicle and shot Cho, or any of the faces of the men that ran by him. *Id.* at

237-40.  A police report -- that the People did not timely produce -- stated that Eix was able to positively identify Sonam as the man who fled the driver's side of the car (and thus did not commit the shooting).  *Id.* at 240-41.  The court stated that this was a *Brady* violation and gave an adverse inference instruction to remedy the violation.  *See* Dkt. 4-2 at 23; Dkt. 4-6 at 242; Dkt. 4-10 at 62-63.  The court found that a mistrial was not warranted because Eix was able to be cross-examined about the report.  Dkt. 4-6 at 241.

Additionally, the People informed Sonam's defense counsel that there was an open federal investigation into Song about his involvement in marijuana dealing, and that he had been interviewed by the Federal Bureau of Investigation ("FBI").  *See* Dkt. 4-5 at 167-71.  The People had requested information regarding Song's interview, and the FBI rebuffed the State's requests.  *Id.* at 169-70.  The People disclosed that attempts had been made to attain information but that they were unsuccessful.  After the verdict, the People informed defense counsel that they had received information from the federal authorities that an unnamed source claimed Song had lied in the grand jury and trial in the case.  Dkt. 4 at 11.  Sonam subsequently moved to set aside the verdict due to the People's late disclosure, which the court denied on the grounds that the People had fulfilled its investigative duty under *Rosario* by attempting to procure the statements.  Dkt. 4-1 at 68-69; Dkt. 4-5 at 168-70.  In addressing Sonam's post-trial motion, the court determined that the allegations against Song would merely tend to impeach Song, and did not create a likelihood of a more favorable verdict for Sonam.

Finally, the People elicited testimony from the detectives about the oral and written statements Sonam made during his interrogation at the police precinct on March 16 and March 17, 2011.  Specifically, Sonam's statements about the leadup to the altercation -- including the plan to assist in the purchase of drugs from Song and Cho -- and his statements that after the deal went sour, he had brandished a firearm and pistol-whipped one of the individuals in the vehicle.  Dkt. 4-8 at 85-90.  Prior to the commencement of trial, Sonam attempted to suppress the statements which the court denied.  Dkt. 4-3 at 227.  After the verdict, the court re-opened the suppression hearing regarding Sonam's statements based on the late disclosure of Detective Polo's memobook.  Dkt. 4-10 at 186-89.  In relevant part, Polo's memobook noted that he had made numerous trips between the precinct and the crime scene and that it was unclear what time police read Sonam his *Miranda* rights.  Dkt. 4-10 at 167-68.  Nonetheless, the court credited the detective's claim that he advised Sonam of his *Miranda* rights at 1:00 a.m. and determined that the memobook entries were "insignificant."  Dkt. 4-10 at 187.

On September 10, 2014, the court sentenced the petitioner to an aggregate term of twenty-five years to life in prison.  Dkt. 4-10 at 194, 203.

### 3.    *Direct Appeal*

On April 30, 2018, Sonam perfected his direct appeal to the Appellate Division, Second Department.  *See* Dkt. 4 at 11.  Sonam raised four claims on appeal. First, Sonam claimed the court erred in admitting the supermarket video purporting to

show the altercation.  Second, he contended that the People failed to prove that he had

been advised of his *Miranda* rights and that the court should have suppressed his

statements elicited during his interrogation.  Third, Sonam argued that he was denied

his right to due process when the People untimely disclosed *Brady* material, specifically,

information about Song's alleged dishonesty and involvement in a federal investigation.

Fourth, he claimed that his sentence was cruel and excessive.  *See* Dkt. 4-1 at 6.

       In a decision and order dated February 5, 2020, the Appellate Division

affirmed Sonam's judgment of conviction.  *Sonam I*, 180 A.D.3d at 718.  First, the court

held that Sonam had made his statements to detectives after he had been properly

advised of his *Miranda* rights which he voluntarily and intelligently waived.  *Id*.  Next,

the court found that the police had reasonable suspicion to stop Sonam and detain him

for purposes of a showup identification procedure and likewise declined to suppress

Sonam's statements and eyewitness identification testimony.  *Id*.  The court also agreed

with the trial court's decision to permit admission of the video surveillance footage as

the People had presented "sufficient evidence that the footage accurately represented

the events being depicted."  *Id*. at 719.  Next, the court rejected Sonam's contention that

the evidence adduced at trial was insufficient to sustain his conviction because -- among

other things -- Song's testimony was "neither internally inconsistent nor the source of all

the evidence of [Sonam]'s guilt." *Id*. at 718-19.  Finally, the court held that Sonam's sentence was not excessive.  *Id*. at 719. [4]

On June 29, 2020, the New York Court of Appeals rejected Sonam's application for leave to appeal the decision below.  *Sonam II*, 35 N.Y.3d at 1029 (Feinman, *J*.).  On July 28, 2020, Sonam filed a motion for reconsideration of his leave application which the Court of Appeals denied on September 10, 2020.  *Sonam III*, 35 N.Y.3d at 1097 (Feinman, *J*.).

### 4.  *The Petition*

The Petition was filed December 7, 2021.[5]  In seeking a writ of *habeas corpus* from this Court, Sonam makes the same arguments he raised in his direct appeal below. The People opposed the habeas petition on March 14, 2022.[6]  Dkt. 4 at 17.  Sonam filed a reply on May 14, 2023.  Dkt. 13.

---

[4]   Sonam had also raised several challenges in a *pro se* supplemental brief including that he was denied a fair trial as a result of the People's alleged failure to disclose *Brady* material and that the evidence at trial was legally insufficient to sustain his conviction beyond a reasonable doubt. Dkt. 4-1 at 162-81.  The Appellate Division rejected these challenges.  *Id*. at 719.

[5]   Under the prison mailbox rule, a federal court will consider a pro se litigant's petition for habeas corpus to have been filed as of the date it was given to prison officials.  *See Noble v. Kelly*, 246 F.3d 93, 97-98 (2d Cir. 2001).  Although this Court received Sonam's petition on December 14, 2021, his letter was dated and delivered to the post office for mailing on December 7, 2021.  *See* Dkt. 1 at 17.

[6]   The Petition, filed December 7, 2021, is arguably untimely because AEDPA's one-year statute of limitations runs from "the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or -- if the prisoner elects not to file a petition for certiorari -- the time to seek direct review via certiorari has expired."  *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001).  Under New York law, the judgment becomes final 90 days after leave to appeal to the Court of Appeals is denied, which here occurred on June 29, 2020.  *See* N.Y. Crim. Proc. Law § 460.20.  Accordingly, Sonam's one-year period to file his habeas petition began running on September 26, 2020, and expired September 26, 2021.  Because, however, the AEDPA statute of limitations is not jurisdictional, *see Acosta v. Artuz*, 221 F.3d 117, 121-22 (2d Cir. 2000), and the State did not raise the defense, we consider the Petition on the merits.

On October 3, 2024, the case was reassigned to the undersigned.

## DISCUSSION

### I. Federal Review of State Convictions

Where a petitioner's claim was adjudicated on the merits in state court, a federal court may not grant a habeas petition regarding that claim unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see Harrington v. Richter*, 562 U.S. 86, 97-98 (2011); *Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017). Hence, when a claim is adjudicated on the merits, the state court must be accorded "substantial deference." *Fischer v. Smith*, 780 F.3d 556, 560 (2d Cir. 2015). "A federal court may reverse a state court ruling only where it was 'so lacking in justification that there was . . . [no] possibility for fairminded disagreement.'" *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (per curiam) (quoting *Harrington*, 562 U.S. at 103); *see also Wetzel v. Lambert*, 565 U.S. 520, 524 (2012) (per curiam).

### II. Analysis

In the Petition, Sonam contends that (1) he was denied a fair trial when the Court permitted the People to offer the surveillance video and autopsy report; (2) the

15

court erred in admitting his statements to police because the police failed to administer his *Miranda* rights; (3) he was denied due process because the People engaged in a pattern of discovery violations; (4) his sentence was cruel and excessive; and (5) the evidence was legally insufficient to establish his guilt.  S*ee generally* Dkt. 13; *see also* Dkt. 1-2 at 124.  I address each claim in turn.

     **A.**    *The Admission of the Surveillance Video and Autopsy Report*

     Sonam argues that he was denied a fair trial because the court improperly admitted an unauthenticated surveillance video and autopsy report.  Sonam cannot show that the trial court's admission of the surveillance video and autopsy report involved an unreasonable application of federal law.

     Purported evidentiary errors are rarely a basis for habeas relief.  The Supreme Court has acknowledged its "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts."  *Crane v. Kentucky*, 476 U.S. 683, 689 (1986).  As trial judges are "called upon to make dozens, sometimes hundreds, of decisions concerning the admissibility of evidence" in any given criminal trial, "the Constitution leaves to the judges who must make these decisions 'wide latitude'" in ruling on the admissibility of evidence.  *Id*. at 689-90 (citation omitted).  Consequently, "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus.  Rather, the writ would issue *only* where petitioner can show that the error deprived her of a

*fundamentally fair* trial." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983) (citations omitted).  The erroneous admission of evidence constitutes a denial of due process "only if the evidence in question 'was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992) (citation omitted).

Here, the trial court's decisions to admit the surveillance video and the Appellate Division's affirmance of that decision were reasonable and entitled to deference.  As to the surveillance footage, Song, the surviving witness, testified to the sequence of events that occurred in the video, and four other witnesses were able to testify to events as they occurred that night.  Additionally, the surveillance video was not used for identification purposes because neither Sonam nor Ahn were clearly visible in the footage.  *Cf. Ross*, 955 F.3d at 181.  Indeed, the Appellate Division "agree[d] with the Supreme Court's determination admitting into evidence certain surveillance video footage from a security system located at a grocery store near the subject shooting, as the People presented sufficient evidence that the video footage accurately represented the events being depicted." *Sonam I*, 180 A.D.3d at 719 (first citing *People v. Patterson*, 93 N.Y.2d 80, 84 (1999); and then citing *People v. Wells*, 77 N.Y.S.3d 668 (2d Dep't 2018)).  Moreover, even if the surveillance video was inadmissible, the People relied on ballistics, the testimony of eyewitnesses, and Sonam's own statements in support of his

conviction.  The surveillance video thus neither provided the basis for Sonam's conviction nor removed a reasonable doubt that would have existed without it.

The trial court's decision to admit Cho's autopsy report was also reasonable.  Sonam does not explain why the autopsy report should have been suppressed in his habeas petition, *see* Dkt. 1-2 at 4-7, but previously raised the argument that the copy of the autopsy report was unauthenticated because it was stamped as a "true copy" but not signed by a designated official attesting that the report was a true and complete copy of the original report, *see* Dkt. 4-1 at 24.  The trial court ruled that the autopsy report was properly admitted as a business record, and that the deputy director of the medical institution laid an appropriate foundation that the stamped report was made in the regular course of business.  Dkt. 4-7 at 184-94; *see* N.Y. C.P.L.R. 4518.  There was no error here, much less constitutional error that would warrant federal habeas relief.  For these reasons, Sonam is not entitled to habeas relief on his due process claims.

**B.**    ***The Admission of Sonam's Statements to Police***

Nor is Sonam entitled to habeas relief for his claim that the court improperly admitted the statements he made to police because he was not administered his *Miranda* rights.  Before trial, Sonam moved to suppress the physical property and statements he made as fruits of an unlawful arrest under the Fourth Amendment, and the court denied the motion.  The court ruled that Sonam was "arrested based upon

probable cause," "any statements he made were given knowingly and voluntarily after he had been given and waived his *Miranda* rights," and the "photo arrays [were] nonsuggestive."  Dkt. 4-3 at 226-27.  On appeal, the Appellate Division also held that, "[c]ontrary to the defendant's contention, the statements he made to law enforcement officials at the precinct station house were not subject to suppression, as the record demonstrated that the defendant was properly administered *Miranda* warnings and, thereafter, knowingly, voluntarily, and intelligently waived his *Miranda* rights."  *Sonam I*, 180 A.D.3d at 718 (citations omitted).  The court also noted that "[t]he police had the requisite reasonable suspicion to stop and detain the defendant for a showup identification procedure, based on the defendant's appearance, which matched a general description of the perpetrator broadcast over the police radio, the defendant's temporal and spacial proximity to the crime scene, and the defendant's actions in attempting to flee from the police."  *Id.*

Because Sonam has had a full and fair opportunity to litigate his Fourth Amendment claims, federal habeas relief is unavailable.  "[W]here the State has provided an opportunity for full and fair litigation of [the] claim, the Constitution does not require that a state prisoner be granted federal habeas relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 482 (1976).  Accordingly, Sonam's claim that his statements were improperly admitted are rejected.

19

**C.** **_The Discovery Violations Claim_**

Sonam argues that he was denied due process when the People failed to timely disclose _Brady_ material, namely that Song was under investigation by the federal government; that Eix made a prior statement identifying Sonam as the person who jumped out of the driver's seat; and that Polo's memobook existed.  The Appellate Division affirmed that Sonam's arguments are "without merit."  _Sonam I_, 180 A.D.3d at 719; _see also Wade v. Herbert_, 391 F.3d 135, 142 (2d Cir. 2004) ("If any reasonable ground was available, we must assume the court relied on it.").  Sonam has failed to demonstrate that he suffered prejudice because of the People's late disclosure of evidence, and thus his claim does not rise to constitutional error sufficient to warrant habeas relief.

"The prosecution in a criminal matter has a constitutional obligation to disclose exculpatory evidence to the defendant."  _Jimenez v. Walker_, No. 00-CV-3599, 2003 WL 22952842, at *10 (E.D.N.Y. Nov. 4, 2003), _aff'd_, 458 F.3d 130 (2d Cir. 2006) (first citing _Brady v. Mayland_, 373 U.S. 83 (1967); and then citing _Giglio v. United States_, 405 U.S. 150 (1972)).  In its cases applying _Brady_, the Supreme Court has held that for a defendant to show that constitutional standards of due process were violated, the defendant must demonstrate that "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must

have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  Prejudice for *Brady*

purposes must be "so serious that there is a reasonable probability that the suppressed

evidence would have produced a different verdict." *Id.* at 281.  The rule the Supreme

Court enunciated in *Brady* is broad enough to "encompass[ ] evidence known only to

police investigators and not to the prosecutor." *Id.* at 280-81 (internal quotation marks

and citation omitted).

      Sonam contends only that the People *delayed* in providing *Brady* material,

not that the People failed to disclose *Brady* material *at all*.  "In such cases, '[w]hen the

government delays disclosing exculpatory evidence, the defendant must show a

reasonable probability that an earlier disclosure would have changed the trial's result.'"

*White v. Keane*, 51 F. Supp. 2d 495, 499-500 (S.D.N.Y. 1999) (quoting *United States v.

Dean*, 55 F.3d 640, 663 (D.C. Cir. 1995)).  "Because 'neither *Brady* nor any other case

requires that disclosure under *Brady* must be made before trial,' due process simply

requires that disclosure must not occur so late as to prevent the defendant from 'making

effective use of it.'" *Id.* at 500 (first citing *United States ex rel. Lucas v. Regan*, 503 F.2d 1, 3

n.1 (2d Cir. 1974); and then citing *United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir.

1988)) (alterations adopted).

      Even assuming that each of Eix's statements to police, Song's involvement

in a federal investigation, and Polo's memobook were evidence favorable to Sonam,

suppressed by the People, and prejudicial in a manner sufficient to establish a *Brady*

violation, Sonam has failed to show that the People's disclosure of that evidence occurred so late that it prevented him from using it.

For instance, evidence of Eix's prior inconsistent statement was produced by the People prior to cross-examination. The trial court determined that the late disclosure of the police report containing Eix's inconsistent statement could be remedied by granting defense counsel the opportunity to cross-examine Eix about his statement. Because the People's disclosure occurred before Eix was subject to cross-examination, the result of the trial would have been no different had the People produced the report before the trial started and Sonam did not otherwise suffer prejudice. Accordingly, the late disclosure of the police report does not constitute a *Brady* violation sufficient to warrant habeas relief.

Likewise, the disclosure of Polo's memobook was remedied by the court's reopening of the suppression hearing. The suppression hearing was first requested to determine whether police had probable cause to arrest Sonam. During the second hearing, the court determined that the information from the memobook that "came to light [was] insignificant as to whether or not the defendant in fact was given his *Miranda* warnings and waived them before he made the statements that were testified to." Dkt. 4-10 at 187-88. The court also noted that Polo was cross-examined about his procedural negligence and admitted to not logging every one of his movements on the command logs. The court ultimately ruled that the differences in Polo's testimony

between the original suppression hearing and the reopened suppression hearing were negligible and did not affect his credibility, and that probable cause existed for Sonam's arrest. Sonam is unable to demonstrate that this suppressed evidence would have produced a different verdict had it been introduced earlier, and he is thus not entitled to habeas relief on this claim.

Finally, the People did not commit a *Brady* violation when it untimely disclosed that Song was the target of a federal narcotics investigation. Indeed, the court engaged in a lengthy colloquy with counsel and determined that the State had learned of Song's involvement in a federal investigation shortly before trial started and had properly investigated Song's statements and requested information from the federal authorities but was rebuffed. *See* Dkt. 4-5 at 169-70. The court determined that the People fulfilled its discovery obligations because it had attempted to obtain impeachment evidence, out of its control, to turn over to the defense. *See* Dkt. 4-5 at 168 (citing *People v. Kronberg*, 672 N.Y.S.2d 63 (1st Dep't 1998)). Additionally, the court noted that Song's incriminating statements would not have changed the outcome of the trial because Song was extensively cross-examined about his involvement in Cho's marijuana business and the court gave an adverse inference charge for the late disclosure. Accordingly, Sonam has failed to show that the results of the trial would have been different had that evidence been disclosed earlier. Sonam is therefore not entitled to habeas relief on his third stated ground.

D.  *The Sentencing Claim*

Sonam's claim that his sentence was cruel and excessive also fails.  The Appellate Division considered the claim on the merits and rejected it, concluding that "[t]he sentence imposed was not excessive."  *Sonam I*, 180 A.D.3d at 719 (citing *People v. Suitte*, 90 A.D.2d 80 (1982)).  "No federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law."  *Keane*, 969 F.2d at 1383; *see also Fielding v. LeFevre*, 548 F.2d 1102, 1108 (2d Cir. 1977) ("Essentially, [defendant] asks this Court to review a sentence handed down by a state court, which we are powerless to do.").

Sonam was convicted of murder in the second degree in violation of New York Penal Law § 125.25(1), (3), a Class A-1 felony.  N.Y. Penal Law § 125.25 ("Murder in the second degree is a class A-1 felony.").  A defendant convicted of a class A-1 felony under New York law must be sentenced to at least fifteen years and is subject to a statutory maximum of life imprisonment.  N.Y. Penal Law § 70.  Sonam's sentence of twenty-five years to life was within the range permitted by New York law, and thus no federal constitutional issue is presented.

E.      *The Sufficiency of the Evidence Claim*

In his final claim, Sonam argues that the evidence was legally insufficient to support his second-degree murder conviction.[7]  *See* Dkt. 1-2 at 1; Dkt. 4-1 at 178-84. The Appellate Division rejected this claim because it was "unpreserved for appellate review," *Sonam I*, 115 N.Y.S.3d at 718 (citing *People v. Hawkins*, 11 N.Y.3d 484, 492 (2008)), and thus this determination constitutes an independent and adequate state ground that precludes habeas review.  "[F]ederal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that is independent of the federal question and adequate to support the judgment." *Cone v. Bell*, 556 U.S. 449, 465 (2009) (internal quotation marks and citation omitted).  That is, federal courts may not review a state court ruling that "fairly appear[s] to rest primarily on state procedural law," so long as the procedural bar is "adequate to support the judgment." *Murden v. Artuz*, 497 F.3d 178, 191-92 (2d Cir. 2007) (citations omitted).  Federal courts in this Circuit have repeatedly held that the gatekeeping provisions of New York laws governing a petitioner's failure to raise a claim on direct appeal "represent[] the application of a 'firmly established and regularly

---

[7]      Sonam refers to his sufficiency argument only in the header of his habeas petition but indicates that he raises the same arguments he made in his pro-se supplemental brief on direct appeal to the Appellate Division.  *See* Dkt. 1-2 at 1.  Accordingly, the Court addresses those arguments made in his other pro-se brief. *See, e.g.*, Dkt. 4-1 at 178-84.

followed' New York rule." *Williams v. Goord*, 277 F. Supp. 2d 309, 318-19 (S.D.N.Y. 2003) (citations omitted).

Sonam has failed to demonstrate that he is entitled to an exception to the procedural default rule, because he has not shown either (1) cause and actual prejudice or (2) that a "fundamental miscarriage of justice" would occur if the merits of the federal claim were not considered. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011).

Moreover, even if Sonam's claim was not procedurally barred, it cannot be a basis for habeas relief because Sonam cannot show that the verdict was against the weight of the evidence. *See* 28 U.S.C. § 2254(d)(1). The Appellate Division also considered the sufficiency claim on the merits and held that:

> [v]iewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence, we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor. Upon reviewing the record here, we are satisfied that the verdict was not against the weight of the evidence.

*Id.* at 718-19.

When considering a sufficiency argument on habeas review, "[a] federal court must look to state law to determine the elements of the crime." *Fama v. Comm'r Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000) (citation omitted). A federal court "must

consider whether, as a matter of federal law, there was sufficient evidence for a jury to find that the prosecution proved the substantive elements of the crime as defined by state law." *Einaugler v. Sup. Ct. of New York*, 109 F.3d 836, 839 (2d Cir. 1997) (citations omitted). The reviewing court "must consider the evidence in the light most favorable to the prosecution and make all inferences in its favor." *Fama*, 235 F.2d at 811 (citation omitted). A "petitioner bears a very heavy burden in convincing a federal *habeas* court to grant a petition on the grounds of insufficiency of the evidence." *Id*. (citation omitted). Indeed, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)).

The Appellate Division's rejection of the sufficiency argument is a decision on the merits that is accorded substantial deference. Here, it cannot be said that the Appellate Division's conclusion was "objectively unreasonable." *Id*. Under New York law, a person is guilty of murder in the second degree when either "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person;" or "[a]cting either alone or with one or more other persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the

death of a person other than one of the participants."  N.Y. Penal Law § 125.25(1), (3).

Viewing the evidence presented at trial in the light most favorable to the prosecution, it

is clear that a rational jury "could have found the essential elements of the crime beyond

a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

   The jury heard testimony from eyewitnesses that Sonam hit Song over the

head with a gun, demanded his chain and wallet, and struggled alongside Ahn to take

the briefcase from Cho and flee with the marijuana.  Video surveillance of the incident

was also presented, a gun was found in the car, and ballistics established that two

different guns were fired at the scene.  Thus, viewing the evidence provided in the light

most favorable to the People, *see Fana*, 235 F.3d at 811, a rational jury could have found

beyond a reasonable doubt that Sonam either intentionally caused Cho's death, or,

acting in concert with Ahn, attempted to commit a robbery and in the course of such

robbery caused Cho's death.  Accordingly, Sonam's insufficiency claim does not provide

a basis for habeas relief.

## III. *Sonam's Motion to Stay*

   On December 4, 2024, Sonam moved for a stay and abeyance, stating that

the Petition contains exhausted and unexhausted claims.  *See generally* Dkt. 14.  Sonam

does not specify which of his asserted claims are unexhausted or what additional claims

he wishes to bring before the state courts.  *Id.*  He requests that this Court stay the

instant proceeding and hold the Petition in abeyance while he exhausts his claims in

state court.  *Id.* at 1.  On January 24, 2025, Sonam wrote an additional letter in further support of his motion to stay stating that he "filed a motion in the lower court . . . [that] is currently pending leave of appeal in the Appellate Division, Second Department." Dkt. 15 at 1.  Sonam also stated in the letter that he has "another important issue which [he] ha[s] been researching with diligent effort" that is "of constitutional importance." *Id.*

Generally, a petitioner must exhaust the available state-court remedies before seeking federal habeas review.  28 U.S.C. § 2254(b)(1).  "Exhaustion of state court remedies requires that a habeas petitioner's federal claim must be 'fairly presented' to the state courts."  *Willette v. Fischer*, 508 F.3d 117, 121 (2d Cir. 2007).  If a habeas petition contains both exhausted and unexhausted claims, it is "mixed" and must be dismissed unless the petitioner can demonstrate that it meets criteria for a "stay and abeyance," *see Rhines v. Weber*, 544 U.S. 269, 277-78 (2005), or agrees to proceed on the exhausted claims only, s*ee Rose v. Lundy*, 455 U.S. 509, 510 (1982).  Ordering a stay and abeyance is rare, and appropriate only when (1) the petitioner has demonstrated "good cause"[8] for his

---

[8]     The Supreme Court has not defined "good cause," but district courts in this circuit have determined that it "requires a showing of either (1) some factor external to the petitioner that gave rise to the default or (2) reasonable confusion, which is more forgiving and incorporates the petitioner's subjective reasons for the delay in seeking state relief."  *Dupree v. Royce*, No. 20-CV-1443, 2021 WL 4439877, at *2 (E.D.N.Y. Sept. 28, 2021) (alterations adopted) (quoting *Jeffrey v. Capra*, No. 20-CV-232, 2020 WL 4719629, at *2 (E.D.N.Y. Aug. 12, 2020)); *see also Whitley v. Ercole*, 509 F. Supp. 2d 410, 417-19 (S.D.N.Y. 2007).

failure to exhaust his claims; (2) the unexhausted claims are meritorious; and (3) he did not engage in subversive litigation tactics. *Rhines*, 544 U.S. at 277-78.

None of Sonam's asserted claims are unexhausted; in fact, each of his stated claims has been brought before the state courts. Sonam asserts in his original motion that he "discovered that [his] habeas petition contains exhausted and unexhausted claims," and that he "believe[s] that [he] ha[s] [a] potentially meritorious claim in [his] petition." Dkt. 14 at 1. But Sonam fails to specify which of the claims asserted in the Petition are unexhausted. He alleges only that he is not "engaging in abusive litigation[] tactics[s]," but otherwise does not provide reasons as to why he did not exhaust his unstated claims in state court. *Id.* Additionally, he fails to provide good cause in his additional letter of support, noting only that the issue he is researching "is of constitutional importance." Dkt. 15 at 1. Because Sonam's stated claims were exhausted in the state courts, and his purported additional claims are vague and indiscernible, his motion for a stay and abeyance is denied. *See Rhines*, 544 U.S. at 277 (""[T]he district court would abuse its discretion if it were to grant [the petitioner] a stay when his unexhausted claims are plainly meritless.").

## CONCLUSION

Sonam has failed to show a basis for relief under 28 U.S.C. § 2254. Accordingly, the Petition is denied. Additionally, I decline to issue a certificate of appealability because Sonam has not made a substantial showing of the denial of a

constitutional right.  *See* 28 U.S.C. § 2253.  Pursuant to 28 U.S.C. § 1915(a)(3), I certify that any appeal taken from this decision and order would not be taken in good faith.

The Clerk of the Court shall enter judgment accordingly and close this case.  The Clerk shall also mail copies of this memorandum decision and the judgment to Sonam at his last known address.

It is further ordered that the Clerk of Court shall deny Sonam's motion to stay (Dkt. 14).

SO ORDERED.

Dated:      New York, New York
            March 28, 2025

_____
DENNY CHIN
United States Circuit Judge
Sitting by Designation